## HERTZEL v. WEBER.

(Circuit Court of Appeals, Eighth Circuit. September 11, 1922.)

No. 5975.

1. **Courts ⬿312(1)—Grantee's action for trespass subsequent to conveyance within jurisdiction of federal court by reason of diverse citizenship, though grantor and defendants were citizens of same state.**

Where Indians, after execution of oil and gas leases approved by the Secretary of Interior, under Act July 1, 1902, conveyed the land to third party, the federal court had jurisdiction of third party's action for trespass during period subsequent to conveyance by reason of diversity of citizenship though lessors and the defendant in such action were citizens of the same state.

2. **Courts ⬿312(1)—Grantee's action for trespass committed prior to conveyance held within jurisdiction of federal court by reason of diversity of citizenship, though grantor and defendant are citizens of same state; "chose in action."**

Where Indians, after execution of oil and gas lease approved by Secretary of the Interior, under Act July 1, 1902, conveyed the land to a third party, the federal court had jurisdiction of grantee's action for damages for trespass alleged to have entered on and extracted oil from land prior to conveyance because of diversity of citizenship, though lessors and the defendant were citizens of the same state, and notwithstanding Act Aug. 13, 1888 (Comp. St. 1901, § 629), providing that the federal court shall not have jurisdiction in action on a "chose in action in favor of any assignee," unless the suit could have been prosecuted in such court if no assignment or transfer had been made; the right acquired by such grantee not being a "chose in action," within such statute.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Chose in Action.]

3. **Indians ⬿16(6)—Lessees' contract with third party, not consented to by lessors and Secretary of the Interior, as required by lease, held voidable merely, and not void.**

Where leases executed by Indians, approved by the Secretary of the Interior, under Act July 1, 1902, provided that no sublease assignment, or transfer of any interest therein could be made without the written consent of the lessor and Secretary of the Interior, and that such assignment or transfer, made without such consent, should be void, lessees' contract with third party for development of the land by third party for oil and gas, in consideration of a portion of the oil and gas produced, made without the written consent of the lessors and the Secretary of the Interior, *held* merely voidable, and as such valid until avoided, and not absolutely void; such contract not being against public policy.

4. **Indians ⬿16(6)—Indians' grantee, who prevented Indians' lessees from applying for consent to contract with third party, could not defeat third party's right to contract by claim that contract was void for want of such consent.**

Where Indians' oil and gas lease required the written consent of the Indians and the Secretary of the Interior to an assignment by lessee of any right thereunder, one who by his own conduct prevented lessee from applying to the lessors and the Secretary of the Interior for their consent to contract with third party could not, after purchasing the lands from the Indians, avail himself of the failure to obtain written consent to lessees' contract with third party to defeat third party's right thereunder, since he could not take advantage of his own wrong in a court of equity, and set up requirements not made for his benefit by a contract to which he was not a party.

**5. Judgment ⟨key⟩704—Determination as to right of third party to certain portion of oil and gas produced held res judicata in codefendant's suit as to validity of third party's contract with lessee, entitling him to such portion of the oil and gas produced.**

Judgment rendered in lessee's action against third party, to whom lessee had transferred the right to a certain portion of the oil and gas extracted, and others who claimed third party's interest, adjudging that third party was the lawful and exclusive owner of specified per cent. of the oil and gas produced, *held* res judicata in the subsequent action by one of the codefendants, after conveyance to him of the land, against third party for trespass, as to the validity of third party's contract with lessee.

**6. Estoppel ⟨key⟩90(2)—Grantee, who permitted third party under contract with grantors' lessee to develop land without denying his right to so do, held estopped from denying validity of contract after production of oil.**

One who purchased leased lands with knowledge that a third party claimed the right to produce oil and gas under contract with the vendors' lessee without giving third party notice that he had become owner of the land and that he denied third party's right to such contract, and though third party was engaged in operations to develop the land for production of oil and gas, was estopped from denying third party's right under such contract with lessee after third party succeeded in producing.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Colin Neblett, Judge.

Action by Freeman E. Hertzel against Howard Weber. Decree for defendant, and plaintiff appeals. Affirmed.

See, also, 230 Fed. 965, 145 C. C. A. 159.

C. B. Ames, of Oklahoma City, Okl. (Ames, Chambers, Lowe & Richardson, of Oklahoma City, Okl., and J. P. O'Meara, of Tulsa, Okl., on the brief), for appellant.

John J. Shea, of Tulsa, Okl. (Thomas F. Shea, of Tulsa, Okl., on the brief), for appellee.

Before LEWIS and KENYON, Circuit Judges, and JOHNSON, District Judge.

LEWIS, Circuit Judge. In November, 1905, two Cherokee Indians gave oil and gas leases for terms of fifteen years on lands which had been allotted to them. Pursuant to the requirements of the seventy-second section of the Act of July 1, 1902 (32 Stat. 716), both leases were approved by the Secretary of the Interior. The Act and the regulations of the Secretary were referred to in the leases as authority under which they were made. Each lease contained this:

"And it is mutually understood and agreed that no sublease, assignment or transfer of this lease or of any interest therein or thereunder can be directly or indirectly made without the written consent thereto of the lessor and the Secretary of the Interior first obtained, and that any such assignment or transfer made or attempted without such consent shall be void," and that if any of the covenants, stipulations or provisions of the lease were violated by the lessee, its sublessee, heirs, assigns, etc., "then the party of the first part [lessor] shall be at liberty in her discretion to avoid this indenture of lease and cause the same to be annulled, when all the rights, franchises, and privileges of the party of the second part [lessee], his sublessees, heirs, executors, administrators, successors or assigns hereunder shall cease and end without further proceedings."

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Soon after the leases were given each lessee had a verbal understanding with Howard Weber, appellee, that he should go upon the leased premises and drill and prospect for oil and gas, and if those minerals were found in paying quantities he was to continue thereon throughout the terms of the leases in the production and sale of those minerals in accordance with the requirements of the leases; in consideration of which Weber was to receive three-fourths of the oil and gas produced, the lessees the remaining one-fourth. The leases each reserved to the lessor a royalty of 10% of the value of the oil produced and named amounts for each gas well. Under the arrangement made between the lessees and Weber the lessees were to take and receive the output and distribute the proceeds between Weber and the lessors, retaining 15%. Weber agreed to bear all expenses of drilling and operation. It was the intention of the lessees and of Weber that the agreement between them should be reduced to written form, but before this was done the appellant Hertzel met Weber and expressed a wish to join with him in his arrangement with the lessees. They soon reached a verbal understanding that Hertzel should have a two-thirds interest with Weber, provided Hertzel would pay Weber $5,000 and also drill a well on each tract without cost or expense to Weber. Hertzel desired that one Barnsdall, who had oil and gas leases on other lands in the Indian Territory, should share equally with him the two-thirds, and he told Weber that he would at once see Barnsdall about it. Hertzel was at that time in the Indian Territory and had his understanding with Weber there. He then left for his home in Pennsylvania. Weber informed the lessees that contracts might be prepared in accordance with his prior understanding with them, making, however, Barnsdall and Hertzell, as well as himself, parties thereto. Before Hertzel left the Indian Territory he told Weber that he could proceed at once with drilling operations, that bills for the cost and expense of developing the property might be sent to him at his home in Pennsylvania and he would advance money to meet the same, that to reimburse him for so doing, all moneys received for the three-fourths' interest in the oil, after production began, should be remitted to him by the lessees until he was repaid for the advancements. Hertzel saw Barnsdall and told him the arrangement that he had made with Weber, but Barnsdall declined to become a party to it and told Hertzell that Weber had no interest in the matter, that Weber was Barnsdall's agent and had made the arrangement with the lessees for Barnsdall, but this was not communicated to Weber by Hertzel. The contracts with the lessees were drawn up and signed by them as requested by Weber, by the terms of which the three named persons were jointly and equally interested. Weber sent them on to Hertzel for his and Barnsdall's signatures, and drew a draft on Hertzell for the $5,000. The draft was dishonored, but Weber was not informed as to the reasons therefor. He drew a second draft a few weeks later on Hertzel and wrote him that if it were not paid and if he and Barnsdall did not proceed to drill a well on each tract he would assume that they did not intend to perform the arrangement that he had made with Hertzel and that he would thereupon pro-

ceed to develop the lands for himself. That draft was also dishonored and no explanation given therefor. The lands proved to be productive, and as soon as the returns from oil for the three-fourths' interest in the hands of the lessees were sufficient in amount to reimburse Hertzel for what he had advanced, Weber notified the lessees that all sums thereafter received by them for the three-fourths should be paid to him, that Hertzel had no interest therein.

Thereafter and in August, 1907, the lessees brought a suit in the Territorial court against Weber, Hertzell and Barnsdall, in which it was alleged that they had in hand more than $20,000 in which they had no interest, that the money had come into their possession from the working of the two leases, that the leases were then being operated and that from time to time thereafter other and additional funds would come to them from the same source, that said funds were and would be received and held in trust for those to whom they may belong, that said funds belonged to defendants, but as to which one it belonged plaintiffs did not know and had no means of knowing, and averred that all of it was claimed by defendant Weber but that defendants Hertzell and Barnsdall also claimed it, and prayed that the court require the parties to interplead and adjust their conflicting claims, both as to the funds then in hand as well as such funds as might arise out of the future operation of the leases. Weber answered and claimed that he was entitled to all of it. Hertzel and Barnsdall answered jointly and claimed that they were entitled to all of it. A master was appointed and took the proof. Pending the cause the Indian Territory became a part of the State of Oklahoma, and under the Enabling Act the suit was transferred to the district court of Washington County, Oklahoma, in which it reached final decree in favor of Weber in February, 1910. Hertzel and Barnsdall took an appeal to the Supreme Court of the State and the judgment in favor of Weber was affirmed by an opinion of that court rendered on November 14, 1911. The decree adjudged that Weber was "the lawful, sole, exclusive owner in his own name and right of seventy-five per centum of all the oil and gas, or either, produced or to be produced from the said Moore the Mode allotments or either, as covered by said original leases thereon (the two leases which had been approved by the Secretary on January 18, 1906), and which has been or may hereafter be produced by reason of any operations or developments therefor under or pursuant to the said original leases thereon, respectively, or under or pursuant to the said drilling contracts or said assignments thereof, as herein directed to be made to the said Howard Weber in his sole and exclusive right and so to be such owner as of and from the 18th day of January, 1906." It directed the lessees to execute to Weber a written contract in the same form and as of the same date as the contract which had been prepared in favor of Weber, Hertzel and Barnsdall, but which was never executed by the three persons named, that the lessees should pay to Weber all of the funds in their hands received from three-fourths of the oil and gas produced and to be produced from the premises. It found that Hertzel and Barnsdall had no inter-

est in the subject in litigation and it enjoined each of them from interfering with the rights adjudged to Weber.

Within two months prior to the entry of this decree the appellant purchased from the lessors the two leased tracts and procured from them warranty deeds conveying the leased premises to himself. Hertzel having lost in his litigation with Weber in the State court, then brought this action against him in the United States District Court for the Eastern District of Oklahoma, basing his right to relief on the fact that he had become the owner in fee of the leased premises, coupled with his claim that Weber's arrangement with the lessees was void. His complaint contains four causes of action. The first count is in ejectment for the leased lands. The second alleges the date (January 8, 1910) on which he purchased one of the tracts, that since that time Weber has been in the unlawful possession thereof, has produced therefrom oil of the value of $123,664.45, that said oil was the property of plaintiff and he prays damages. The third alleges the date (December 16, 1909) on which he purchased the other tract, that Weber has since that time been in the unlawful possession of that tract, that he has produced from said land and sold oil of the value of $95,101.93, which was the sole property of plaintiff, and he asks damages; and the fourth alleges that Weber was in the unlawful possession of one of the tracts from November 14, 1905, to December 16, 1909, at which last date plaintiff acquired title to that tract, that during said time Weber produced oil from that tract of the value of at least $30,000, that on September 20, 1911, his grantor of that tract assigned and transferred to him her claim and right of action against defendant for the oil produced therefrom by him, that Weber converted the oil so produced by him during said time to his own use, and he asks damages therefor.

Before this cause came on for trial the terms of the original leases and Weber's contracts with the lessees had expired and he had quit the premises. The first count was in consequence dismissed. A written stipulation waiving a jury was filed, motion to transfer the cause to the equity side was sustained without objection, and on final hearing decree went in favor of defendant Weber on each of the three counts, from which Hertzel has brought this appeal.

[1, 2] The subject that requires first consideration is that of jurisdiction, which was challenged by Weber in his answer and is urged here in argument and brief. It is said that the second and third counts are rested on the deeds of conveyance from the two lessors, the fourth on the written assignment from one of them, and that the effect of those instruments was to put Hertzel in the position of assignee of the lessors, and that inasmuch as diversity of citizenship is the only ground of jurisdiction Hertzel could not bring and maintain this action because his assignors could not, Weber and they being citizens of the same State. That part of the Act of August 13, 1888 (25 Stat. 434, U. S. Comp. Stat. 1901, § 629), reading: "* * * Nor shall any circuit or district court have cognizance of any suit, except upon foreign bills of exchange, to recover the contents of any promissory note or other chose in action in favor of any assignee * * * unless

such suit might have been prosecuted in such court to recover the said contents if no assignment or transfer had been made," is relied on. The second and third counts are for damages for alleged trespasses on the respective tracts after conveyances from the lessors to appellant, and it is plain that those causes of action were never in the lessors, and hence were not assigned by them. The allegations are that the trespasses were committed, the oil extracted by Weber and converted to his use and the damages inflicted while title to each tract was vested in appellant. The facts as to the fourth count are different. It alleges that appellee trespassed on one of the tracts during a period of time prior to the date on which appellant became the owner, that long after that tract was conveyed to him his grantor assigned and transferred to him by written instrument all claim and right of action which she had for the oil unlawfully produced by appellee during said trespasses and while it was the property of his grantor. There is no allegation that appellant paid anything for the assignment but it is not claimed that the facts set up are insufficient to constitute a good assignment under the law of the State, nor that they would not there support a good cause of action. Corbin v. Black Hawk County, 105 U. S. 659, 26 L. Ed. 1136, is cited in support, and it is urged that it sustains the contention that the court was without jurisdiction. But the subject-matter and right that was assigned, assuming it to have been a valid transfer under the local rule, was not a chose in action within the meaning of the Congressional Act. In Bushnell v. Kennedy, 9 Wall. 387, 19 L. Ed. 736, where this question was under consideration, it was said that under the terms chose in action "are included all debts and all claims for damages for breach of contract, or for torts connected with contract." We find no controlling authority since, changing, enlarging or modifying the ruling in that case. See also Sheldon v. Sill, 8 How. 441, 12 L. Ed. 1147; Ambler v. Eppinger, 137 U. S. 480, 11 Sup. Ct. 173, 34 L. Ed. 765; Kolze v. Hoadley, 200 U. S. 76, 26 Sup. Ct. 220, 50 L. Ed. 377. It is our opinion that the court had jurisdiction over each of the three causes of action.

[3] On the merits, the right of recovery on any of the three counts does not exist unless appellant's counsel can sustain their proposition that the contracts between the lessees and Weber were void—not merely voidable. For that purpose they rely on Muskogee Land Co. v. Mullins, 165 Fed. 179, 91 C. C. A. 213, 16 Ann. Cas. 387; Alfrey v. Colbert, 168 Fed. 231, 93 C. C. A. 517; Barnsdall v. Owen, 200 Fed. 519, 118 C. C. A. 623; and Chapman v. Siler, 30 Okl. 714, 120 Pac. 608. We are not persuaded that those cases lend support to their contention. In the Mullins case the Creek Indian allottees were permitted by Act of Congress to rent their allotments for a term not to exceed one year for grazing purposes only, and for not to exceed five years for agricultural purposes; and the Act declared that any agreement or lease violative of its terms should be absolutely void. The land company sublet allotted lands to Mullins for a term of two years. He remained in possession one year and refused to occupy the premises longer or to pay rent for the second year. The action was to recover the second year's rent. His lease on its face purported to be for

agricultural purposes, but he testified that its real purpose was to enable him to make use of the premises for grazing purposes, in violation of the statute. The land company stood upon the terms of its sublease to Mullins, which showed that it was for agricultural purposes, and declined to disclose the terms and conditions on which it rented from the allottees. The court, accepting the testimony of Mullins, which was uncontradicted, reached the conclusion that the allottees had made a contract with the land company in violation of the terms of the statute, and the conclusion followed that the sublease was void. But it was the prohibited acts of the Indian allottees which sustained that conclusion. The land company having no right to the premises, gave nothing to Mullins by its sublease. There can be no doubt that if the lease to the land company had been made in good faith for agricultural purposes for a term of five years, and the sublease to Mullins had been for two years of that term, no such conclusion would have been reached in that case. In Alfrey's case this court held that a deed made by an Indian allottee in violation of the prohibition of the statute was void, being declared so by statute, and a decree canceling it was sustained. In the Chapman case it was held that a lease given by a Choctaw Indian woman on restricted lands in violation of the provisions of the Atoka Agreement, which was approved by Act of Congress, was void. No such situation is presented in the present case. The leases given by the Indians on their allotments were valid agreements; they were executed in strict compliance with the requirements of the statute, receiving the approval of the Secretary. The contracts which we are asked to hold void are those made between the lessees and Weber, and that solely because of the provision contained in the leases. In Barnsdall's case, he violated the regulations of the Secretary prohibiting anyone from being interested in leases on allotted lands to the extent of more than 4,800 acres. He had reached that limit before making a contract with Owen for interests in additional lands on which Owen had leases. Fearing that the Secretary would not approve his arrangement with Owen on that account, he and Owen canceled their contract. He later sued Owen and alleged that at the time they canceled the contract Owen promised him that he would make another contract identical in terms with that canceled but with some party to be designated by Barnsdall, which contract, however, should be for Barnsdall's benefit. The relief sought was the enforcement of performance by Owen. This court, in affirming the judgment denying relief said:

"The plan set forth in the bill appears to have been one to circumvent the regulations of the Secretary of the Interior, to dissolve temporarily a contract relation which it was feared, and rightly so, would, if known, prevent his approval of the leases (to Owen), and then, after approval was secured, to restore it in the name of some third party for complainant's benefit, thus accomplishing the same object by indirection. A contract, the direct and sole object of which is the deception of a public official in the performance of his duties, is contrary to public policy and void. A court of equity will neither enforce such a contract nor aid the parties to regain their prior status. It will leave them as it found them."

It appeared in that case that the regulations of the Secretary, in addition to requiring a showing that the lessee was not directly or indirectly interested in leases embracing more than 4,800 acres, also required a showing that the application for the lease was not made by one who did not intend himself to conduct operations on the land. It is not shown here that the regulations were violated in either respect, or in any other respect when Weber made his arrangements with the lessees, nor while he was engaged in performing that agreement on his part. So far as the record shows, he conducted the operations in developing the lands and producing oil therefrom, and he was not interested in leases on lands exceeding the maximum acreage; indeed, it does not appear that he was interested in any other lease. In the Barnsdall case this court said that the purpose of that regulation was to prevent the natural resources of the Indian lands from falling into the control of a few hands. The Weber contracts, then, were not prohibited by any law, nor did they violate a public policy declared by Congress or by the Secretary, and it is our conclusion that the authorities cited and relied upon do not support appellant's proposition.

We come, then to the effect of the stipulation in each lease which provides that a sublease, assignment or transfer of any interest in the leased premises without the written consent of the lessor and the Secretary should be void; but this was only contractual between the parties to those leases. It was inserted for the benefit and protection of the interests of the lessors, and we see no reason why the general rule of construction, applied to the terms used, whether found in statute or contract, should not prevail here. If the party making the contract with the lessee should be acceptable to the lessor and the Secretary, the terms of the contract unobjectionable to them, his ability to carry on operations in accordance with the terms of the lease undoubted, and the making of the contract was not violative of the regulations made in the interest of the lessors and of the public, there could be no reason why it should be stricken down and annulled. Nothing of the kind has been shown here, and we think the term was used in the sense of voidable, and not void. Westerlund v. Black Bear Mining Co., 203 Fed. 599, 611, 612, 121 C. C. A. 627, 639, 640:

"One of these rules is that an act declared to be void by statute which is malum in se or against public policy is utterly void and incapable of ratification, but an act or contract so declared void, which is neither wrong in itself nor against public policy, but which has been declared void for the protection or benefit of a certain party, or class of parties, is voidable only and is capable of ratification by the acts or silence of the beneficiary or beneficiaries. * * * Such an act or contract is valid until avoided, not void until validated, and it is subject to ratification and estoppel."

[4] Furthermore, the conduct of Hertzel prevented an application to the lessors and the Secretary for their consent to Weber's contracts. The lessors declined to act until the State court had adjudicated the claim of Hertzel, and after that case was finally decided against him and Weber has performed in accordance with the decree in his favor, Hertzel cannot be heard to take advantage of his own wrong in a court of equity and set up requirements not made for his benefit and to which he was not a party.

[5] We are also of opinion that the defense of res adjudicata was made out. It is insisted for appellant that the question as to the validity of Weber's contracts was not in issue in the State court, and that that is the one issue made here. It cannot be doubted that Hertzel asserted the validity of the contracts which Weber had agreed on with the lessees, as much so as if he had expressly alleged their validity in his answer. He and Barnsdall claimed all of the fund then in the hands of the lessees and all to be thereafter received by them from the oil to be produced on the leased tracts, and they did so on no other ground than that Weber had made those contracts for Barnsdall as his agent. But when Hertzel came to testify he said that he claimed only a third interest in those funds, and this was nothing else than an assertion by him of the validity of Weber's contracts made on Weber's account, in which he was to have an interest. Weber, Hertzel and Barnsdall all claimed under the same contracts, the ones made by Weber with the lessees. None of them made any other claim, and the question presented for decision by the State court was, who of the three were interested in it? The court adjudged that the contracts with Weber were valid and binding contracts, but that Hertzel and Barnsdall had no interest in them, otherwise it could not have decreed that the lessees should formally execute and deliver to Weber an instrument in writing expressing the terms of his agreements with them. In Freeman on Judgments, 4th Ed., Chap. XII, entitled: "The Judgment as an Estoppel," these principles are stated:

"A judgment is conclusive upon every matter actually and necessarily decided in the former suit, though not then directly the point in issue. If the facts involved in the second suit are so cardinal that without them the former decision cannot stand, they must now be taken as conclusively settled. * * * A judgment necessarily affirming or denying a fact is conclusive of its existence whenever it becomes a matter in issue between the same parties. * * * It is not necessary to the conclusiveness of the former judgment that the issue should have been taken upon the precise point which it is proposed to controvert in the collateral action. It is sufficient if that point was essential to the former judgment. Every point which has been either expressly or by necessary implication in issue, which must necessarily have been decided in order to support the judgment or decree, is concluded. * * * And a fact is necessarily determined to exist or not to exist if its existence or non-existence is required to support the judgment rendered."

Black on Judgments, at Sections 613 and 615, states it thus:

"Necessary and inevitable inferences—facts without which the judgment could not have been rendered—are equally covered by the estoppel as if they were specifically found in so many words. * * * In other words, it is conclusive evidence of whatever it was necessary for the jury to have found in order to warrant the verdict in the former action, and no further."

The judgment of the State court in Weber's favor can be supported upon no other theory than that the court found the contracts which he had with the lessees were valid and binding obligations, and that he had a right to conduct mining operations on the two tracts in accordance with the terms of the leases. But all of that aside, and conceding that the validity of Weber's contracts was not an issue in that case, still it is a waste of words to contend that the question

283 F.—59

to whom at least three-fourths of the value of the oil produced under the Weber contracts belonged was not in issue. The pleadings expressly made it an issue, and the court decided that issue in favor of Weber and adjudged that he was entitled to all of it. That conclusion was reached because the court necessarily found that Weber was there by right under the terms of his contracts. That finding established the fact, as between him and Hertzel, that he was not a trespasser upon the property. But the gravamen of the charge in each count is trespass, the establishment of which is indispensable to recovery.

[6] Equitable estoppel is also pleaded as a defense, and that is another reason why Hertzel's appeal cannot be sustained. He knew from the beginning that Weber claimed to be in possession by right, operating the property under valid contracts with the lessees. He obtained deeds conveying to him the leased premises prior to the date of the decree in the State court. There is no testimony showing that he notified Weber at any time until he brought this suit that he had become owner of the properties and that he claimed that Weber was in possession without right under void contracts, and that he intended to oust him. He sat by and permitted Weber to continue in the hazardous venture of mining operations, which may be profitable one day and disastrous the next. He insisted throughout the litigation in the State courts that the arrangement which Weber had made with the lessees was a valid and binding obligation and that he was entitled to an interest in it. After such conduct he should be estopped on familiar principles from thereafter asserting the contrary. Johnston v. Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214. The doctrine of estoppel in pais "proceeds upon the ground that he who has been silent as to his alleged rights when he ought in good faith to have spoken, shall not be heard to speak when he ought to be silent." Morgan v. Railroad Co., 96 U. S. 716, 24 L. Ed. 743.

Conceding for the moment that Weber's contracts were in their inception void, and that the defense of res adjudicata was not sustained, we hold that Hertzel's conduct estops him from claiming that he did not take title to the tracts subject to the rights which those contracts purported to give to Weber.

For the reasons stated the decree is affirmed.