## WORLEY v. CARROLL.

No. 15072—Opinion Filed March 3, 1925.

Rehearing Denied June 16, 1925.

**1. Brokers — Production of Responsible Contractor—Compliance with Contract.**

Where a brokerage contract created an exclusive agency for a term of 60 days and provided compensation for the broker in the event such broker would produce a responsible party ready, able, and willing to contract, held, that the securing of such responsible party within the 60 days and the introduction of said party to the owner was a sufficient compliance with the brokerage contract, although a written contract for the signature of the owner was not presented until the 61st day.

**2. Same — Legality of Contract — Departmental Oil and Gas Lease on Indian Lands.**

Indian's lessee who prevented broker from applying for consent to contract with lessee could not defeat broker's right to contract by claim that contract was void for want of consent. Where an oil and gas mining lease on departmental form required the written consent of the Secretary of the Interior to an assignment of an interest therein by lessee, and said lessee refused to execute such assignment though bound to do so by contract, and thereby prevented said third party from applying to the Secretary of the Interior for consent to contract, said lessee cannot be heard to say that said contract is void as a violation of the rules and regulations of the Secretary of the Interior, since said lessee will not be permitted to take advantage of his own wrong in a court of equity. Hertzel v. Weber, Circuit Court of Appeals, Eighth Circuit, 283 Fed. 921, followed.

**3. Trial—Demurrer to Evidence.**

A demurrer to the evidence admits all of the facts produced, together with all reasonable inferences therefrom, and in the event such facts and inferences disclose a cause of action, it is error to sustain such demurrer.

(Syllabus by Lyons, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Kay County; Claude Duval, Judge.

Action by H. F. Worley against Evelyn Carroll. Judgment for defendant, and plaintiff appeals. Reversed and remanded, with directions.

David L. Carter and Woodard & Westhafer, for plaintiff in error.

Sam K. Sullivan and R. J. Shive, for defendant in error.

Opinion by LYONS, C. Parties will be referred to as in the court below. Defendant was the owner of an oil and gas mining lease on the allotment of a Kaw Indian, said lease being on departmental form. Defendant desired to secure a drilling contract on the lands covered by said lease and employed the plaintiff as a broker to find a responsible party to drill a well on the premises covered by said lease.

The contract contains the following material provisions:

First. The owner does hereby agree with the said agent that for the period of 60 days from the date hereof he shall have the sole and exclusive right to negotiate for a drilling contract with some responsible party to drill a well on said premises covered by said lease and that she will enter into and execute any such contract that such agent may agree upon; provided, only that said owner is to receive in any such contract not less than an undivided one-sixteenth overriding royalty from such well and such premises covered by such lease in all oil and gas produced thereon, over and above the one-eighth royalty to be paid to the lessor.

Second. That in the event the broker is unable to make a drilling contract on a royalty basis, then the owner agrees to execute any such contract which the agent may arrange with a responsible party on a working interest basis; provided, that the owner is to have and retain not less than a three-sixteenth working interest.

Third. If the broker shall produce a responsible party ready, able, and willing to enter into such contract, either on a royalty basis or a working interest basis, the owner agrees to give the broker one-fourth of the royalty or one-fourth of such working interest which is given to or retained by the owner under the terms of the contingent drilling contract.

Fourth. That if the broker or the party with whom he may arrange a drilling contract can procure donations toward the expense of drilling, either as offset money, dry hole money, or in any other manner, the owner is not to participate therein, but the broker may have the same in addition to his one-fourth interest.

This contract requires construction, and it seems to us to be very plain upon its face that it is a brokerage contract giving an exclusive agency for a period of 60 days, and that the broker must produce a responsible party ready, able, and willing to contract within said period of 60 days.

The evidence in the case discloses that on the 28th day of June, 1922, which appears to be the 60th day, the broker had this proposition pending with two parties, one, the Skelly Oil Company, and the other, the Enid Drilling Company. A Mr. Lee, who was acting on behalf of the Enid Company, and who designated himself as an authorized agent, had agreed on behalf of said company to take the proposition if Skelly did not. Skelly's decision on the matter was announced on the morning of June 29th, and he decided not to take said proposition. Lee thereupon entered into a drilling contract on behalf of the Enid Drilling Company, and this contract met the requirements of the brokerage contract. On June 29th, when the written contract of the Enid Drilling Company was exhibited to the defendant for execution, she refused to proceed further with the matter and declined to execute said contract.

There is testimony in the record disclosing that Lee, on June 28, received his authorization from Thatcher, president of the Enid Drilling Company, to consummate a contract on behalf of said Enid Drilling Company, and thereafter, within a day or two, the Enid Drilling Company executed a formal written authorization by its president and secretary, in the authorized mode in which a contract is executed by a corporation. This ratification appears on page 162 of the case-made and is as follows:

"Whereas, a certain contract was entered into on the 28th day of June, 1922, between the Enid Drilling Company and Evelyn Carroll, concerning the drilling of a well on the south half of the southwest quarter of section 15, township 27 north, range five east, in Kay county, Oklahoma, and, whereas said contract being signed Enid Drilling Company, by H. W. Lee, authorized agent:

"Now, therefore, we, the said Enid Drilling Company, hereby ratify the said contract and accept the same in the manner and to the same effect as if said contract had been signed by the president and secretary of the Enid Drilling Company, and in all things confirm and ratify the said contract and accept the obligations therein contained and defined on the part of the Enid Drilling Company, and agree to carry out said contract according to its tenor and effect,

"Dated this 28th day of June, 1922.

"Enid Drilling Company,

"W. L. Thatcher, President.

"Attest:

"E. D. Thatcher, Secretary."

On June 28, 1922, the date of the Osage sale, the following conversation took place between the plaintiff and the defendant, on the train going back to Pawhuska:

"Q. You may answer the question? A. On June 28, 1922.

"Q. Where was that, Mr. Worley? A. Pawhuska, Okla.

"Q. When did you notify Mrs. Carroll of that fact? A. On the train going back to Pawhuska, Okla., on the day of June 28, 1922.

"Q. What did you state to her about it? A. I told her I had entered into an agreement with the Enid Drilling Company with which to drill a well on this lease, on terms in accordance with my contract giving her a 1-64 overriding royalty—1-16 overriding royalty, as per my contract with her.

"Q. What did she say at that time? (Objected to as incompetent, irrelevant, and immaterial. Objection overruled. Exception.) A. She said that was all right, she would accept it. The Court: When was that? A. On June 28th, going back on the train from Pawhuska.

"Q. Why are you positive that was the date, Mr. Worley? A. Because of the day that the Osage sale was held at Pawhuska. The Court: June 28th? A. Yes, sir."

The trial court sustained a demurrer to the evidence, and the defendant contends that the judgment of the trial court was correct for two reasons:

(1) That the evidence fails to disclose performance of the contract by the plaintiff.

(2) That the contract is void and against public policy.

We think it clearly appears from the evidence set forth and referred to that the contract was performed if this testimony is to be taken as true. The contract merely required the plaintiff to produce a responsible party within the 60 day period, able, ready, and willing to drill on the terms specified. Such a party was produced and the fact thereof was communicated to the defendant. We are unable to conclude that because the acceptance of the proposition by the Enid Drilling Company was contingent upon Skelly's rejection thereof that such situation is material, in view of the fact that Skelly rejected said proposition and that the Enid Drilling Company forthwith, on June 29, in pursuance of its former conditional acceptance, carried out its agreement and executed a proper written agreement, binding it to drill.

The contract requires the broker to see that a person ready, able, and willing to perform was presented to the defendant within the 60 days. Such performance was

had when the responsible party was found within that time and said fact communicated within that time to the owner.

The fact that the written contract was not presented to the defendant until June 29, under these facts and circumstances, cannot be material upon familiar principles which govern the rights of brokers and their principals.

"Of course if the terms of his employment merely require the broker to find or introduce a purchaser within a certain time, or if his commissions are promised for a sale 'effected in any wise through his influence or instrumentality,' within a fixed period, he is legally entitled to the promised remunerations if he induces a person to begin negotiations with his employer before the expiration of the period named, even though such negotiations do not materialize until after the time limit is reached." 4 Ruling Case Law, p. 306, sec. 47.

"A broker's contract for commission payable upon consummation of exchange within 24 hours,' referred to execution of exchange agreement and not to actual exchange of deeds where exchange agreement provided for 30 days to examine title." Levy v. Dusenbery (Cal.) 163 Pac. 231.

That real estate broker's term of agency expires before a sale is actually consummated does not deprive him of his right to commission, if within the time limit he procures a customer ready, able, and willing to purchase upon the stipulated terms, to whom a sale is effected without interruption of the negotiations. Everson v. Phelps, 104 Ore. 288, 206 Pac. 306, 26 A. L. R. 780.

Where property is listed with a real estate agent for sale, and the agent introduces or discloses the name of the purchaser to the vendor for such purpose, and through such introduction or disclosure negotiations are begun for the sale of the property which resulted in the sale by the owner, the agent will be entitled to his commission. Harris v. Owenby, 58 Okla. 667, 160 Pac. 596; Also Oullahan v. Baldwin (Cal.) 35 Pac. 310.

"Where a broker's authorization to sell land was in force when the sale took place, his rights were not affected by the fact that the deed did not pass until later." Hill v. McCoy (Cal.) 81 Pac. 1015.

Where a broker contracts to furnish a purchaser ready, able, and willing to purchase described property on the owner's terms, he is not required to produce the purchaser's written contract of purchase unless the contract so provides. See Moore v. Mazon Estate, 24 N. M. 666; Gilliland v. Jaynes, 36 Okla. 563, 129 Pac. 8;

Hopkins v. Settles, 46 Okla. 801, 149 Pac. 890; Bailey v. Rowe, 33 Okla. 51, 124 Pac. 282 (this case is authority for the proposition that waiver by owner is sufficient); Bleecker v. Miller, 40 Okla. 374, 138 Pac. 809; Rawlings v. Ufer, 61 Okla. 299, 161 Pac. 183.

We pass now to the discussion of the appellee's contention that the contract is void for the reason that it affects a departmental lease made by a Kaw Indian. It is claimed that because the lease requires an assignment of an interest therein to be approved by the Secretary, and because this brokerage contract was not so approved, that the same is contrary to law and unenforceable. The case of Hardy v. Deskins, 95 Okla. 108, 215 Pac. 738, is relied upon as authority for this conclusion, and while some of the language of said case might be thought to be applicable, an investigation discloses that a totally unlike question was considered therein. In that case a departmental oil and gas mining lease had been taken and had been submitted to the Secretary for approval. It was necessary for the lessee to submit to the Secretary with the lease an affidavit that he was the sole owner thereof, and that no other person had any interest therein. The regulations requiring this were well known and all persons were charged with knowledge thereof. In contravention of the regulation a third party contracted for a one-half interest therein to vest at the time of the approval. This was practically a contract for a secret interest and involved the commission of perjury on the part of the lessee. An examination of the record in the case of Hardy v. Deskins, supra, discloses the foregoing situation. Therefore the contract in that case is within the rule announced in the Supreme Court of the United States in Anderson v. Carkins, 10 Sup. Ct. 905, 135 U. S. 483, and announced further by the Circuit Court of Appeals of the Eighth Circuit in the case of Barnsdall v. Owen, 200 Fed. 519, where the following occurs:

"Owen had secured some oil and gas leases from Cherokee Indian allottees the validity of which depended upon their approval by the Secretary of the Interior, Act July 1, 1902, c. 1375, 32 State 726. Regulations of the Secretary in force at the time and applicable to the case provided that 'no lease shall be sublet, transferred or assigned' without his consent and approval, that an applicant for the approval of an oil and gas lease must state under oath that he is not directly or indirectly interested in leases of that character embracing more than 4,800 acres, and that applications

by persons who do not themselves intend to conduct operations on the land will be rejected. The leases from the Indians to Owen were on forms prescribed by the Secretary, and each contained a provision 'that no sublease, assignment or transfer of this lease or any interest therein or thereunder can be made without the written consent of the lessor and the Secretary of the Interior first obtained,' also that it was subject to the regulations lawfully prescribed, and that the lessor might annul this lease for a violation of any of its stipulations. Barnsdall had already reached the prescribed maximum of leased acreage. Notwithstanding these things, Owen and Barnsdall entered into a contract before the leases were approved, which, when the Secretary called upon the former for sworn proof touching matters in the regulations, they feared would result in their abrogation and total loss. So they indorsed a cancellation on their contract, dated it back some months, and signed it. Barnsdall specifically alleges in his bill that the consideration moving to him for this was Owen's oral promise to make another contract in identical terms with that canceled, but with some party he (Barnsdall) might designate, the new or substituted contract to be submitted to the Secretary, if his approval was deemed essential to its validity, when Barnsdall made the designation; that until Barnsdall made the designation he should continue to receive his substantial dues under the canceled contract; and that the substitute, when made, should nevertheless be for his benefit. * * *

"With these principles in mind, let us examine the contract between Barnsdall and Owen, which the former wishes restored. It put Barnsdall in charge of the operations for oil and gas, and gave him the same privileges and subjected him to the same restrictions as were granted and imposed upon Owen by the leases. Saving the right of Barnsdall to terminate the contract as to any of the leases after exploration, it was to endure during the entire leasehold term. It was 'binding upon the heirs, executors, administrators, and assigns of both of the parties.' Barnsdall's operations were to be carried on at his own expense, subject to reimbursement from the proceeds of oil if any were found. If any of the land proved to be gas-producing, without oil, he was to have the entire benefit, except he was to pay Owen $10 per acre of gas territory and also the royalty due the lessors. If gas territory once proved ceased as such, and turned to oil, Owen was to refund the $10 per acre, and thereafter share the oil with Barnsdall. Owen incurred no personal responsibility for Barnsdall's expenditures for oil wells. The latter was to be reimbursed out of the proceeds of the oil after the royalties were paid and the balance was to be divided equally. In respect of the operations, each lease was to be independent of the others, so that, if one was unprofitable, Owen should still have his half of the oil profits of the others. Barnsdall was to offset all paying oil wells drilled within 800 feet of the leased lands. The tanks, etc., placed by Barnsdall on the leased premises were to remain his property until they were fully paid for out of the proceeds of oil, when they were to own them equally. In all cases the royalties due the Indian lessors were to be paid through Owen, by Barnsdall as to the gas, and by both as to the oil.

"It needs no discussion to show that this was not a mere working agreement or employment of Barnsdall's services for the development of the lands. It transferred to Barnsdall Owen's entire interest under the the leases of gas-producing land, and admitted him to a complete half interest of those of oil. Whether technically an assignment or a subletting is immaterial. It was a transfer of interest contrary to the leases, the form of which was prescribed by the Secretary, and it also violated the limitation prescribed by him to prevent the natural resources of the Indian lands from falling into the control of a few hands. The retention of Owen as the medium of royalty payments does not affect the substantial character of the contract.

"The plan set forth in the bill appears to have been one to circumvent the regulations of the Secretary of the Interior, to dissolve temporarily a contract relation which it was feared, and rightly so, would, if known, prevent his approval of the leases, and then, after approval was secured, to restore it in the name of some third party for complainant's benefit, thus accomplishing the same object by indirection. A contract, the direct and sole object of which is the deception of a public official in the performance of his duties, is contrary to public policy and void. A court of equity will neither enforce such a contract nor aid the parties to regain their prior status. It will leave them as it found them. Something is said about the machinery, etc., which complainant put on the premises. We do not determine his right to it in this case; if he had one, he can assert it in an action at law.

In the case at bar the lease had been approved; the defendant was the sole owner thereof. She had a right to contract for the disposal of any interest therein. It was her duty upon the performance by the plaintiff to execute to him an assignment on departmental form which could be submitted to the Secretary of the Interior for his approval. She prevented this from being done by her own act and she cannot be heard to invoke the rule of estoppel.

The situation here is ruled by the deci-

sion of the Circuit Court of Appeals of the Eighth Circuit in the case of Hertzel v. Weber, 283 Fed. 921, where the following occurs:

"On the merits, the right of recovery on any of the three counts, does not exist unless the appellant's counsel can sustain their proposition that the contracts between the lessees and Weber were void—not merely voidable. For that purpose they rely on Muskogee Land Co. v. Mullins, 165 Fed. 179, 91 C. C. A. 213, 16 Ann. Cas. 387; Alfrey v. Colbert, 168 Fed. 231, 93 C. C. A. 517; Barnsdall v. Owen, 200 Fed. 519, 118 C. C. A. 623; and Chapman v. Siler, 30 Okla. 714, 120 Pac. 608. We are not persuaded that these cases lend support to their contention. In the Mullins Case the Creek Indian allottees were permitted by Act of Congress to rent their allotments for a term of not to exceed one year for grazing purposes only, and not to exceed five years for agricultural purposes; and the Act declared that any agreement or lease violative of its terms should be absolutely void. The land company sublet allotted lands to Mullins for a term of two years. He remained in possession one year and refused to occupy the premises longer or to pay rent for the second year. The action was to recover the second year's rent, His lease on its face purported to be for agricultural purposes, but he testified that its real purpose was to enable him to make use of the premises for grazing purposes, in violation of the statute. The land company stood upon the terms of its sublease to Mullins, which showed that it was for agricultural purposes, and declined to disclose the terms and conditions on which it rented from the allottees. The court, accepting the testimony of Mullins, which was uncontradicted, reached the conclusion that the allottees had made a contract with the land company in violation of the terms of the statute, and the conclusion followed that the sublease was void. But it was the prohibited acts of the Indian allottees which sustained the conclusion. The land company having no right to the premises, gave nothing to Mullins by its sublease. There can be no doubt that if the lease of the land company had been made in good faith for agricultural purposes for a term of five years, and the sublease to Mullins had been for two years of that term, no such conclusion would have been reached in that case. In Alfrey's Case this court held that a deed made by an Indian allottee in violation of the prohibition of the statute was void, being declared so by statute, and a decree cancelling it was sustained. In the Chapman Case it was held that a lease given by a Choctaw Indian woman on restricted lands in violation of the provisions of the Atoka agreement, which was approved by Act of Congress, was void. No such situation was presented in the present case. The leases given by the Indians on their allotments were valid agreements; they

were executed in strict compliance with the requirements of the statute, receiving the approval of the Secretary. The contracts which we are asked to hold void are those made between the lessees and Weber, and that solely because of the provision contained in the leases. In Barnsdall's Case, he violated the regulations of the Secretary prohibiting anyone from being interested in leases on allotted lands to the extent of more than 4,800 acres. He had reached that limit before making a contract with Owen for interests in additional lands on which Owen had leases. Fearing that the Secretary would not approve his arrangement with Owen on that account, he and Owen cancelled their contract. He later sued Owen and alleged that at the time they canceled the contract Owen promised him that he would make another contract identical in terms with that canceled, but with some party to be designated by Barnsdall, which contract, however, should be for Barnsdall's benefit. The relief sought was the enforcement of performance by Owen. This court in affirming the judgment denying relief said: 'The plan set forth in the bill appears to have been one to circumvent the regulations of the Secretary of the Interior, to dissolve temporarily a contract relation which it was feared, and rightly so, would, if known, prevent his approval of the leases (to Owen) and then, after approval was secured, to restore it in the name of some third party for complainant's benefit, thus accomplishing the same object by indirection. A contract, the direct and sole object of which is the deception of a public official in the performance of his duties, is contrary to public policy and void. A court of equity will neither enforce such a contract nor aid the parties to regain their prior status. It will leave them as it found them.'

"It appears in that case that the regulations of the Secretary, in addition to requiring a showing that the lessee was not directly or indirectly interested in leases embracing more than 4,800 acres, also required a showing that the application for the lease was not made by one who did not intend himself to conduct operations on the land. It is not shown here that the regulations were violated in either respect, or in any other respect when Weber made his arrangements with the lessees, nor while he was engaged in performing that agreement on his part. So far as the record shows he conducted the operations in developing the lands and producing oil therefrom, and he was not interested in leases on lands exceeding the maximum acreage; indeed, it does not appear that he was interested in any other lease. In the Barnsdall Case this court said that the purpose of that regulation was to prevent the natural resources of the Indian lands from falling into the control of a few hands. The Weber contracts, then, were not prohibited by any law, nor did they violate a public policy declared by Congress or by

the Secretary, and it is our conclusion that the authorities cited and relied upon do not support appellant's proposition.

"We come, then, to the effect of the stipulation in each lease which provides, that a sublease, assignment or transfer or any interest in the leased premises without the written consent of the lessor, and the Secretary would be void; but this was only contractual between the parties to those leases. It was inserted for the benefit and protection of the interests of the lessors, and we see no reason why the general rule of construction, applied to the terms used, whether found in statute or contract, should not prevail here. If the party making the contract with the lessee should be acceptable to the lessor and the Secretary, the terms or the contract unobjectionable to them, his ability to carry on operations in accordance with the terms of the lease undoubted, and the making of the contract was not violative of the regulations made in the interests of the lessors and of the public, there could be no reas. n why it should be stricken down and annulled. Nothing of the kind has been shown here and we think the term was used in the sense of voidable and not void. Westerlund v. Black Bar Mining Co., 203 Fed. 599, 611, 612, 121 C. C. A. 627, 639, 640. 'One of these rules is that an act declared to be void by statute which is malum in se or against public policy is utterly void and incapable of ratification, but an act or contract so declared void, which is neither wrong in itself nor against public policy, but which has been declared void for the protection or benefit of a certain party, or class of parties, is voidable only and is capable of ratification by the acts or silence of the beneficiary or beneficiaries * * * Such an act or contract is valid until avoided, not void until validated, and it is subject to validation and estoppel.'

"Furthermore, the conduct of Hertzel prevented an application to the lessors and the Secretary for their consent to Weber's contracts. The lessors declined to act until the state court had adjudicated the claim of Hertzel, and after that case was finally decided against him and Weber had performed in accordance with the decree in his favor, Hertzel cannot be heard to take advantage of his own wrong in a court of equity and set up requirements not made for his benefit and to which he was not a party."

It will be seen, therefore, that the evidence introduced on behalf of plaintiff and the inferences therefrom make out a prima facie case of performance of the contract, and there is no impediment to the granting of relief thereunder by reason of the rules and regulations of the Secretary of the Interior. Therefore the judgment of the trial court is erroneous and must be reversed.

The cause is reversed and remanded, with directions to grant a new trial.

By the Court: It is so ordered.

Note.—See under (1) 9 C. J. p. 608; (2) 31 C. J. p. 522 (1926 Anno); (3) 38 Cyc. pp. 1543, 1548.